UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF TENNESSEE

---

JAMES EDWARDS,

Plaintiff,

v. Civil Action No.:

TONY SAMOJEN, 3:25-CV-08174-SPL

Defendant.

---

VIDEOTAPED DEPOSITION

---

WITNESS: BRADLEY A. YOUMANS

DATE: Thursday, July 30, 2026

START TIME: 11:04 a.m., ET

END TIME: 3:26 p.m., ET

REMOTE LOCATION: Remote Legal platform

PROCEEDINGS OFFICER: Nicole Mazzara

JOB NO.: 52664

A P P E A R A N C E S

MCDONALD HOPKINS
300 North La Salle Drive
Suite 1400
Chicago, Illinois 60654
By: MICHAEL CROGHAN, ESQUIRE
mcroghan@mcdonaldhopkins.com
Appearing for Plaintiff

SILENCE LAW GROUP, PLLC
20235 North Cave Creek Road
Suite 104 #460
Phoenix, Arizona 85024
By: TREVOR COOK, ESQUIRE
trevor@silencelaw.com
Appearing for Defendant

ALSO PRESENT:
Tony Samojen, Observer

I N D E X O F T E S T I M O N Y


EXAMINATION OF BRADLEY A. YOUMANS: PAGE

By Mr. Croghan 7

By Mr. Cook 119

# I N D E X O F E X H I B I T S

(available for download)


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Porsche 914/6 Report (011, Orange) | 13 |
| 2 | Porsche 914 6GT Tribute Report | 96 |
| 3 | Ford GT Report | 88 |
| 4 | Parts Value Report | 69 |
| 5 | The Supplement Report | 53 |
| 9 | Email 5/19/26 | 91 |
| 10 | Email 6/11/26 | 75 |
| 11 | Email 6/16/26 | 99 |

P R O C E E D I N G S

THE PROCEEDINGS OFFICER: Good morning. We are now on the record. Today's date is July 30, 2026, and the time is approximately 11:04 a.m., Eastern Standard Time.

My name is Nicole Mazzara, and I am the officer designated by Remote Legal, 11 Broadway, Suite 468, New York, New York, to take the recording of this proceeding.

This is the video-recorded deposition of Bradley Youmans, taken in the matter of James Edwards versus Tony Samojen, Case Number 3:25-CV-08174-SPL, filed in the United States District Court for the Middle District of Tennessee.

Would all counsel please identify themselves for the record and state who they represent, starting with the noticing attorney.

MR. CROGHAN: Yes. Michael Croghan, representing the plaintiffs, James Edwards.

MR. COOK: Trevor Cook, representing the defendant, Tony Samojen.

THE PROCEEDINGS OFFICER: Thank you.

Would all observers please identify themselves for the record.

MR. YOUMANS: Bradley Youmans.

THE PROCEEDINGS OFFICER: Sir, not -- I'm sorry. Apologies.

Mr. Samojen?

MR. COOK: Tony, are you there?

THE PROCEEDINGS OFFICER: Tony Samojen --

MR. SAMOJEN: I'm here.

THE PROCEEDINGS OFFICER: Can you please state your name, sir?

MR. YOUMANS: Is that me?

THE PROCEEDINGS OFFICER: Mr. Samojen.

MR. YOUMANS: Oh. I'm sorry.

THE PROCEEDINGS OFFICER: All right. Tony Samojen is an observer today.

This video-recorded deposition is being taken remotely on behalf of the plaintiff and is being conducted pursuant to the procedural rules and laws governing this matter.

As such, all parties agree to this means of capturing the official record, which may include recording by audio, audiovisual, and/or stenographic means, and agree not to oppose admissibility of the testimony in this proceeding on the basis of the personnel or method by which the testimony was captured.

Further, all parties agree that the proceedings officer or person administering the oath may

be authorized to administer the oath under the rules where they reside.

Do the parties so stipulate?

MR. CROGHAN: Yes.

MR. COOK: Yes.

MR. YOUMANS: Yes.

THE PROCEEDINGS OFFICER: I'll now swear in the witness.

Mr. Youmans, please state and spell your name for the record.

MR. YOUMANS: Bradley A. Youmans Y-O-U-M-A-N-S.

THE PROCEEDINGS OFFICER: Thank you, sir.

Do you swear or affirm the testimony you shall give today in this proceeding will be the truth, the whole truth, and nothing but the truth?

MR. YOUMANS: Yes.

WHEREUPON,

B R A D L E Y A . Y O U M A N S ,

having been called as a witness, being duly sworn by the notary public present, testified as follows:

THE PROCEEDINGS OFFICER: Okay. You can lower your hand.

You may proceed.

EXAMINATION

A Yes.
Q Okay. How many times have you testified as an expert at deposition or trial in the past four years?
A Once.
Q And your supplemental letter discloses one Porter versus Hatfield in June 2023.
Is that the complete list?
A Yes.
Q Were you testifying for the plaintiff or for the defendant?
A The defendant.
Q Did that case go to trial or just deposition?
A It settled.
Q But you were test -- you did testify in a deposition in that case, correct?
A Yes. Very long.
Q Very long deposition, is that what you said?
A Yes. It took four hours.
Q Okay. And could you tell me what you were valuing in that case?
A A 1955 Chevrolet two-door coupe.
Q Was that it?
A Yes.
Q Okay. And have you ever had your opinions disqualified by a court?

A No.
Q Okay. And that case, Porter versus Hatfield, did not go to trial, correct?
A No.
Q Before we discuss any specific number today, can you identify the methods and techniques that you used in valuing these vehicles and parts?
A Yes. We -- we do the originality, the condition of everything, craftsmanship, the way it's put together, document the numbers on the vehicle.
And then we pull comparables out of our own database that we know that a -- a certified appraiser or inspection agent has put their hands on.
And then through that group, in consultation with headquarters, we come up with a value.
Q Okay. So you said you relied on comparable sales or comps as one method, correct?
A Yes.
Q Did you also rely on publicly published price guides?
A We look at them and we keep a market trend, but they are so all over the place that we don't rely on those.
Q Okay. And that's my question. Did you rely on published price guides in this case?

A No.
Q Rely. Okay.
A No. No.
Q Did you rely on your own general experience in the collector car market?
A Yes.
Q Okay. Is there any other method, source, or approach that you use beyond comps and your own experience?
A No.
Q So comps and your own personal experience is the complete and exhaustive list of every method that factored into your value conclusions, correct?
A Yes.
Q Okay. I want to talk about your methodology a little bit more --
(Phone rings.)
THE WITNESS: Sorry about that.
MR. CROGHAN: That's okay.
THE WITNESS: Turn that thing off. I thought it was off.
MR. CROGHAN: I do that too, sometimes.
BY MR. CROGHAN:
Q Sir Youmans, did you follow a written, repeatable methodology in applying your comps and

experience to reach your valuation numbers?
A Yes. We have forms that are in our database, and they're -- they're a guideline. And that way, every single agent that works for Auto Appraisal Group and everybody in the office, we all follow the same steps every single time. Try to stay consistent.
Q And are those steps you just described identified in your work papers or your report here?
A Just briefly, but no.
Q Okay. When you say just briefly, what do you mean? Because you also said no, so I'm trying to understand if those guidelines are identified in the papers I have.
A The rankings are identified: superior, outstanding, very good, sound, fair, serviceable, poor. And then the paragraph underneath that, "Based on our research and market survey," that's where we're using the forms.
Q Market survey, is that what you said?
A It says market survey, yes. But that's --
Q What page -- what page is that on?
A That's on page 2.
Q Page 2 of your reports?
A Yes. The market survey kind of falls into the value trends. It's not a dead-set number, but we can

see if trending, if vehicles are trending up, trending down, flat.

Q So what you're saying is that in the report that you -- your final report in this case, on page 2, you have listed out condition rank ratings and then stated that based on your research and market survey, you determined a price; is that right?

A Yes.

Q But my -- and I understand that. My question is when you -- when you actually determine what the condition rating is and when you actually do that market survey, did you, in any --

In your final report, did you identify how you came to your -- specifically how you came to your conclusion?

A No.

Q Okay.

A No.

Q Okay. Did your appraisal work in this case comply with the USPAP, United -- Uniform Standards of Professional Appraisal Practice?

A You'd have to -- you'd have to quote it to me.

Q You don't know?

A No.

Q Okay.

A I do know that those associations mainly focus on antiques and personal property and housing and businesses and all that type stuff, which have very little to do with what I do.

Q Okay. But you don't know, as you sit here today, whether your appraisal work in this case complies with the United -- strike that.

The Uniform Standards of Professional Appraisal Practice, right?

A I do not know that.

Q Okay. And you testified earlier that you do not hold an accredited member designation from the American Society of Appraisers, right?

A Correct.

Q So without confirmation of Uniform Standard of Professional Appraisal Practice compliance and without an American Society of Appraisers accreditation, is it fair to say your valuations rest primarily on your general experience with collector vehicles rather than a recognized independent professional standard?

A No.

Q Why is that?

A Because of the training I went through with that Auto Appraisal Group.

Q But that's not an independent standard, right?

That's a standard within a private organization, right?
A Yes.
Q So that's not -- so let me -- let me ask it again. Strike that. I'll move on.
A Have you ever heard of Avery versus State Farm?
Q Well, Mr. Youmans, we could have that discussion after the deposition is concluded.
A I was just going to say -- I mean, you're asking me about my credentials and how we come about our values.
That is one case that's easily looked up, and they loved our values. They loved our evaluation. They loved the way we did it.
Q Were you involved in that case personally?
A Not personally, no.
Q Okay. Let me ask you a question about price guides. Did you consult any price guides in this project?
A Only our database. It's not a price guide. It does --
Q So what's -- so when --
A It does get used by price guide people.
Q Okay. So your database, which you just mentioned, in this case, did your database ever give you

buy cars cheap. So you have to look -- look at the vehicle itself, look at what's sitting there.

Get all of -- get all of those facts, then start looking at your dollar figures.

Q Right. But I -- and I said -- I asked you whether you -- if there are multiple prices that you are looking at in your methodology, I asked whether you had to then weight those different -- decide how to weight those different values.

Do you understand what I mean by that?

A Adjust it for the timeline?

Q When I say weight. So if you have one vehicle you're trying to value. Okay?

And you find three comparable sales and they're at different price points, you have to decide which price point to give weight to, correct?

A We -- we will take all of them, look at the -- look at the timelines, and then come up with an average to start with. Then start fine-tuning it.

Q Okay. And so when you fine-tune it, do you fine-tune it according to some objective, stated, identifiable rule, or is that kind of based on your own experience?

A Little bit of both. We do -- we -- we watch to see what is going on, what people are buying, what

they're selling. We -- we do get some public records that we use, and it kind of helps fine-tune the market trend.

You know, if they say they're up 15 percent, but you look at what actually sold in the last month or the month that that vehicle we're trying to get a timeline on, and they're trending down, then instead of 15 percent up, it should be 12, 10 percent up.

You have to -- you have to adjust it for the time and what's being actually sold. We don't like to use anything that's an asking price or something somebody just said.

We'd like to see a title change hands and money change hands. And then we've got a solid number.

Q Okay. And is this process that you're describing now, where you make adjustments to the market data you're getting, is there a guideline or a -- any type of written standard that you follow when you make those adjustments?

Or are you -- again, are you just relying on your general experience and how you feel when you're doing it at that time?

A General experience. It's -- it's practically an art form.

Q Right. So there's no general guideline that

you use when you are trying to weight the data, right?
A Just what I just described to you.
Q Okay. And you mentioned your market data within Auto Appraisal Group, right?
A Yes.
Q Was that market data provided as part of your expert report?
A No. That's proprietary information because the only thing that we keep in there is going to be our conditions and what those values were.
We're also going to have in there -- of course, we're going to break it all down. But that's -- our database, and these cars that we just did, they'll be part of the database, but we're not going to give out any names, VIN numbers, addresses, phone numbers, nothing.
Q Okay. But you used your Auto Appraisal Group internal marketplace data as part of your research that you relied on in the values that you came to in this case, correct?
A Yes.
Q And you just told me that you did not provide that information in your report because it's proprietary data, correct?
A Yes. We just do it for -- use it for

research.

Q Right. But you also relied on it in coming to the values in this case, correct?

A Yes.

Q And you did not provide it as part of your report, correct?

A No.

Q Because it's a proprietary data, right?

A Yes.

Q Okay. Could another appraiser, given only your work papers and not your internal market data from Auto Appraisal Group, reproduce your final value without needing to ask you any follow-up questions?

A I'm not sure what you're asking.

Q Okay. So you -- we just talked about the market data you relied on from your records at the Auto Appraisal Group, correct?

A Yes.

Q And you also have -- you have work papers that you -- that you generated in this case, right?

A Yes.

Q And then you have a final report, correct?

A Yes.

Q If I were to give your work papers to another appraiser and that appraiser did not have access to the

Auto Appraisal Group market data that you relied on, would that appraiser be able to reproduce your -- the numbers that you concluded were the value of these vehicles?

A I don't know where he would get his values, but condition and the overall vehicle, yes. He'd be able to look at it and be able to evaluate it from the paper.

Q How is that possible without the market data that you relied on?

A That's what I'm saying. He'd have to have his own.

Q Right. But without your market data -- and let's assume this appraiser does not have access to market data, and he doesn't have access to your market data either, he only has your work papers?

A Well, there's no value written in the work papers.

Q Right. So the only place that value that you relied on came from was from Auto Appraisal Group's internal database, which has not been produced in this case, correct?

A Correct.

Q Okay. Did you physically inspect each of the three vehicles in this case before reaching your value

conclusions?

A Yes.

Q Did you physically inspect the parts identified in your parts value report?

A Physically? No. They gave me the list and the pictures, and I was able to observe some of those parts because they'd actually been put on the car.

The other parts were piled up in an attic, and so I had to work off of the description and the pictures.

Q Okay. So for any vehicle -- any part or component you did not personally inspect, you relied on photographs, right?

A Photographs and description.

Q And who gave you those descriptions?

A They came from Mr. Cook.

Q Okay. Did you speak to Mr. Tony Samojen or Chris Samojen about the vehicle parts?

A They wanted to, but I told Mr. Edwards and I told the Samojens when I got there that I didn't want to hear what the case was about. I didn't want them to trial -- use me to trial it.

I didn't want to know anything except just the hard data. I said, I'm here to inspect the vehicle and tell Mr. Cook what this vehicle's worth. So let me do

that, and if I have any questions, I'll ask.
But that's --
Q Did you ever -- did you ever --
A -- that's one of my strict rules. I don't -- I don't want to confuse everything. I like to keep everything clean and straightforward.
Q Before the inspection, did you speak to Chris Samojen or Tony Samojen about the vehicles or the parts?
A I spoke with Chris on the phone before I flew out, just to get a sense of where the car was and what my timeline was going to be getting there and his availability.
As far as the conditions of any of that stuff, no.
Q Okay. And you're talking about the Ford GT, correct?
A Yes.
Q Before you inspected the Porsches at Mr. Edwards' collection, did you speak to Chris or Tony Samojen about those vehicles and those parts --
A No.
Q -- before your inspection?
A No.
Q After your inspection, did you speak to Chris Samojen or Tony Samojen about the Porsche vehicles or

the parts?

A No.

Q You didn't speak -- you didn't speak to Tony Samojen after your inspection?

A I spoke with Tony -- I'm trying to remember if it was beforehand or after. I did speak with Tony one time, and he was telling me all this stuff he could give me.

And I told him that I was going to get the inspections completed and ask him if he had any more documents relating to the cars.

And they did have one document, and it had to do with internet stuff, and I didn't even look at it.

Q Okay. And was this before or after your inspection?

A I want to say this was the day I got out to Arizona to do the inspection. I want to say when I got to the hotel, I actually talked to -- that's when I actually talked to Tony.

Q Okay. And that's one conversation with Tony that you recall, correct?

A I think that's the only conversation I ever had with him. I spoke with Chris before I went out there, and then I think he called me to let me know that he was going to send some information through Mr. Cook.

Q And that was after your inspection?
A That would have been before I inspected the Porsches.
Q Okay. After you inspected the Porsches, did you speak to Chris or Tony Samojen about your inspection?
A No. I don't believe I spoke to anybody after that, other than headquarters.
Q After you prepared your draft report and before you issued your final report, did you speak to Chris or Tony Samojen?
A No. I know it isn't after.
Q Did you -- did you ever speak to Chris or Tony Samojen about the engine that was in the Porsche 1543 they sold to Jim Edwards?
A Yes. Now, that conversation was -- that was mentioned with Tony.
Q Before or after you inspected the Porsches?
A That was -- that was before I inspected it.
Q What did he tell you about that?
A He told me that that engine was built and put in the car, and he did not think it was in that car anymore.
Q Did he tell you what he thought that engine was worth?

A No. He -- he provided a receipt showing what they paid to have it built.
Q Is that receipt in your report?
A No. Mr. Cook had a copy of it. You should have a copy of that.
Q Do you remember what the cost of that engine was on the receipt?
A Hang on. Hang on. Because he sent it to me in an email, and it's in here.
Q Did you rely on that receipt as part of your value of the 1543 Porsche?
A No. It wasn't in the car. That wouldn't make sense.
Q But didn't you value -- also provide an opinion on the value of the car had the former engine remained in the car?
A Let me see here. Let me look. If I remember right, that was a sticking point, because one of our things is we cannot value something that's not there.
Q I'll tell you. Your report says, "had the former engine remained in the car, the estimated value would have been 215,000 to 240,000."
A There you go. And I think we did it at 115. Does that sound right?
Q That is correct. 115.

A Okay. Yes. Okay.
Q And I have a question though, because you relied on that engine receipt as part of your opinion, then, right?
A Yes.
Q But that engine receipt is not identified in your report, correct?
A No.
Q Okay.
A There are so many papers.
Q You did not personally inspect the engine that was in Porsche 1543 when it was sold to Mr. Edwards, correct?
A No. It was not in the car.
Q Right. But you didn't inspect it in any form or fashion, correct? That engine?
A No.
Q Okay. Did you independently -- strike that.
We spoke about the vehicle parts that you valued, and you said that you relied on photographs rather than personal inspection on the vehicle parts, correct?
A Yes.
Q Did you independently verify the authenticity of each component you valued?

A As close as I could by the picture.
Q Did you also rely on the authenticity of those components as you received that information from the Samojens?
And I'm asking, did you -- did you assume that they were authentic because the Samojens told you they were authentic?
A No. No.
Q Okay. So then --
A I've actually -- I got an ace in the hole there. I've actually got a Porsche expert right behind me, and I showed him the pictures.
Q Is -- okay. And did you rely on his -- did you rely on his expertise in verifying the authenticity of those parts?
A He helped me as far as telling me what was what. Yes. If it was supposed to be a 911 intake or 914 heads, or -- and some of the stuff he said you can't tell by the picture what it is. But it did help steer it in the right direction.
And most of the stuff that they have a description on the pictures. Most of that stuff line -- lined up to be right.
Q And you lined it up with this other person within the Auto Appraisal Group, right?

A No. This person owns a Porsche and Volkswagen machine shop.
Q Okay. So you spoke -- you spoke to an individual who owns a Porsche and VW shop about the Porsche parts that you valued in this case, correct?
A Yes. I just wanted to know what his unbiased opinion was of them.
Q And what is his name?
A Billy -- oh Lord. I'm having a senior moment. Fagan.
Q F-A-G-A-N?
A Yes.
Q Okay. And so you consulted with Mr. Fagan about the Porsche parts, but Mr. Fagan is not identified in your report, correct?
A No.
Q And you relied on Mr. Fagan to help you verify the authenticity of the parts, correct?
A Helped me. I just wanted to see what his opinion was, that if there was anything weird and outstanding, you know, that I was missing. And we were pretty much on the same page.
Q Okay.
A So basically just a consultation.
Q But let me just make sure, because I think --

I think we're -- I think we're saying the same thing.

I asked you first if you independently verified the authenticity of the parts.

You said yes, right?

A As best I can from the pictures. I mean, authenticity, to really do that correctly, you got to put your hands on them.

Q Right. But you had the photos, and you did the best you could with the photos. And as part of that authentication with the photographs, you sought out and consulted with Billy Fagan about the parts, correct?

A Yes. I asked him about them because I was looking for outliers. I was looking if they had a picture of something that come off of an Audi.

I didn't want him having it written down as some kind of special Porsche part or a Volkswagen part, and that didn't show up.

Q And the information Mr. Fagan provided corroborated that these -- the parts in question that you valued here were authentic Porsche parts, correct?

A As far as he could tell, yes. He --

Q And you relied -- and you relied on -- you relied on him to help you verify the authenticity of the parts in the photographs, correct?

A To make sure I wasn't missing something.

Q That's a yes, correct?
A Yes.
Q Okay. Apart from the photographs and Mr. Fagan's representations regarding the parts, do you have any other independent basis for confirming the authenticity of the parts that you did not personally inspect?
A Yes. They're listed on the -- they're listed on that parts letter.
Q And the parts letter came from the Samojens, correct?
A No. I made the parts letter.
Q Oh. Okay.
A I used MAR Motorsports parts out of United Kingdom, eBay Motorsports, where there's a lot of this stuff.
Q Okay.
A PMB Performance out of Murray, Utah. AASE Sales out of Galena, California -- or Ohio. Heritage Parts Centre, United Kingdom.
And then there's where I talked to Billy Fagan, discussion with machinist at Porsche -- Porsche mechanic.
Q Okay. Are the credentials we discussed earlier, that you hold with -- as a certified agent in

the Auto Appraisal Group, general automotive credentials or credentials specific to Porsche?
A General.
Q Okay. Do you hold any certification specific to Porsche vehicles?
A No.
Q Do you hold any certification specific to 914s?
A No.
Q Do you hold any certification specific to Ford GTs?
A Not certifications. When I worked at Ford, we did work on them.
Q Okay. But you don't hold any certification specific to Ford GT, correct?
A There's no -- no certification document, nothing like that. I was a certified Ford mechanic at one point.
Q Okay. Do you hold any certification specific to collector vehicle parts?
A No.
Q So is it fair to say your qualification to value these specific vehicles in this case and parts in this case rests on general collector car knowledge rather than credentialed specific expertise?

A Yes.
Q Okay. Can you tell me, right now, as we sit here, the specific standard of value that you applied in each of your reports?
MR. COOK: Objection to form.
BY MR. CROGHAN:
Q You can answer.
A I'm not sure exactly what you're asking.
Q Did you apply standard fair market value, replacement value, insurance value, or some other standard?
A Fair market value is what we were shooting for.
Q Can you identify a source or definition for fair market value that you applied?
A Well, through the sales of parts that -- from those companies I just listed.
Q And I'm -- sorry. I'm speaking about the vehicles and the parts. I'm talking overall --
A Overall --
Q -- whether -- and I'm -- and I'm specifically asking whether you can identify a source or definition of fair market value in a writing that you used?
A Basically, it's what people pay for stuff.
Q Right. But is there a publication or a

written definition of fair market value that you applied that I could go look at?
A No.
Q Okay. Can you tell me the exact date as of which you valued each vehicle and the parts?
A Oh. These were 20 -- 2021. I've got it written down here somewhere. That's one thing I have not looked at.
Q On page 4 of Exhibit 1, which is your report on O11, it says, "The appraised value shown is the estimated fair market value at the time of the vehicle trade in December 2021."
Is that --
A I was fixing to say 2021, but I couldn't remember the month. Yeah. December.
Q And is that for all the vehicles that you valued --
A Yes.
Q -- December 2021 is the date the -- strike -- sorry. Let me --
Is December 2021 the effective date for all of the appraisals you did in this case?
A That's what I was shooting for, yes.
Q Okay. Were you always utilizing a fair market value and a December 2021 date in this assignment, or

(Exhibit 5 marked for identification.)

THE WITNESS: I see it.

BY MR. CROGHAN:

Q And this is your supplemental letter in this case, correct?

A Yes.

Q In this letter, you discuss the importance of VIN verification and certified inspection before classic car transactions, correct?

A Absolutely.

Q And you state that Porsche's factory-built GT competition cars numbered only around 12 to 14, correct?

A Yes.

Q And you distinguish factory original competition cars from cars merely modified with GT spec parts, correct?

A Yes.

Q And you understand that distinction is critical to value, correct?

A Yes.

Q This information in your supplemental letter could have been included in your original report, correct?

A Say again?

Q This information you included in this

supplemental letter could have been included in your original report, correct?

A Could have been -- typically, when we do them, we -- we try to do the report on the vehicle as it is, and then if there's something that needs to be explained, we'll do a cover letter, or we'll add -- we'll add some of it to the actual appraisal.

But in this case, this is a -- it's a unusual car as far as all of the GT parts that it has on it. And so we do the cover letter to cover all of that, to explain what's what.

Q Right. But this cover letter was prepared after your appraisals, correct?

A Yes.

Q Okay. And again, in the letter you discuss the importance of VIN verification and certified inspection before classic car transactions, right?

A Yes.

Q And you acknowledge that Porsche's factory-built GT competition cars numbered only around 12 to 14, right?

A Yes.

Q And you distinguish factory original comp cars from cars merely modified -- cars merely modified with GT spec parts, right?

A Yes.
Q And you acknowledge that those differences are critical to value, right?
A Yes.
Q But still, nowhere in your actual appraisals do you use the term "914/6 R," right?
A No.
Q And nowhere in your appraisals did you investigate whether the VIN corresponds to one of those 12 to 14 factory cars, correct?
A I did the investigation on the VIN numbers, and it did not come up as a GT.
Q That's not in your report, correct?
A No.
Q And your --
A That's so I know what I'm looking at.
Q Say that again?
A That's so I know what I'm looking at. I -- we research VIN numbers on everything that we do.
Q Right. But your VIN number research and investigation was not included in your original report, correct?
A No. But we state what it is.
Q And in your report, not your supplemental letter, but in your original report, you did not cover

any consultation with Porsche factory records or the Porsche archive, correct?
A No.
Q You didn't address the window sticker regarding Porsche 1543 at all, correct?
A No.
Q You did not address the Porsche 1543 promotional cards identifying it as a 914/6 R either, correct?
A No.
Q And you valued Porsche 1543 only as a tribute, not as what it was alleged to be represented by Mr. Samojen, correct?
A Correct.
Q If the -- and I've explained to you that this case is about a claim of fraud in which Mr. Edwards alleges that Mr. Samojen represented that he was buying an authentic factory 914/6 R.
So if that -- if that fraud allegation, that Mr. Edwards was told he was buying an authentic factory 914/6 R, the measure of damages would require knowing the value of an authentic 914/6 R, correct?
A Yes.
MR. COOK: Objection. Outside of the scope of the report.

BY MR. CROGHAN:

Q Okay. You said yes. But your reports address only the value of a tribute car, not the value of what the buyer was told he was receiving, correct?

A Yes.

Q So your opinion, standing alone, do not allow the court or the jury to calculate fraud damages as Mr. Edwards alleges, correct?

MR. COOK: Objection. Form.

THE WITNESS: If you have the value of the tribute, I would say very shortly you could go to Porsche and find out what that was, and you'd have a good idea what the value difference was.

BY MR. CROGHAN:

Q But you need the difference between a 914/6 R and a GT tribute. And you did not provide the value of a 914/6 R, correct?

A No. I did not provide --

MR. COOK: Objection as to all being out of the scope of the report.

BY MR. CROGHAN:

Q You can answer.

A I didn't inspect a GT-R, so I gave the value on what I inspected.

MR. CROGHAN: I'm getting a little lag on

trying to get it set up where it'll sit here.
Q That's all right.
A There. That'll work.
Q Was the receipt for a purchase of the engine or for the service associated with the labor to put the engine in the vehicle?
A The service of the -- service of the engine.
Q Okay.
A Built in --
Q So but that -- but the receipt did not validate the price paid for the engine, correct?
A No. I don't believe it did.
Q Okay. Have you ever seen -- and that receipt is not referenced in your report, correct?
A The one from TRE Motorsports, Porsche from Van Nuys, California? It's not in my report, no. But it was part of the documents I was supplied by Mr. Cook whenever we did the assessment of the car.
Q Okay. And that's my question. My question is whether that receipt that you relied on in valuing the Porsche 1543 was included in your report or referenced in your report.
And the answer is no, correct?
A No.
Q Did you ever see any documentation regarding

the price Mr. Samojen paid for that engine?
A I don't believe I did. No.
Q Okay. Did you speak to the person who allegedly built or rebuilt the engine?
A No. I did not.
Q Did you review any dyno sheets, compression tests, or other technical documentation regarding the engine's condition or performance?
A No.
Q What specific comparable sales did you rely on to arrive at the $215,000 figure at the low end of your range?
A We had several race cars that had similar engines in them, and they were for insurance value, and they had those in the 250 range. And we figured that insurance is higher than fair market value, and we reduced that down.
So between receipt I did have and what people were wanting for that style engine used, buildable, and then had it been in the car with all the other parts, we come up with that evaluation.
Q Okay. And I'm asking you to identify the specific comparable sales you relied on. Meaning what vehicle sale, what VIN number, and what purchase price, and what date.

Can you do that?
A No. I cannot.
Q And why can you not do that?
A Because I do not have that in front of me.
Q And where is that information?
A It would be in the database.
Q Do you have notes that memorialize which transactions you relied on to arrive at your evaluations?
A Just consultation. We did that verbally.
Q And let me make sure I understand. So when you're -- you said that there were multiple sales of race cars that you relied on to -- that were in the $250,000 range.
And you -- those were for insurance purposes, and you reduced that number down to get to your range of 215,000 to 240,000, correct?
A Yes.
Q And you -- those figures, and those transactions are housed in Auto Appraisal Group's internal database, correct?
A Yes.
Q And the internal database and those transactions have not been produced to Mr. Cook or to myself in this case, correct?

A No.

Q And I'm asking whether you have any notes of which transactions you specifically relied on to reach that figure?

A No.

Q So you did the review inside the database -- you did the review inside the database, came up with the number, but did not record any notes about which transactions you relied on, correct?

A No.

Q I'm sorry. I -- is that -- that's not correct or that is correct?

A No. I had a consultation. The vehicles were told to me out of the database what -- what they were, the condition rating, the year model, what style motor they had in them.

And we were told that that is the same style motor that was in this car. And so we determined that had that motor been in that car, it would fall in that range.

Q And who did you have that consultation with?

A It would have been John and Larry at Auto Appraisal Group.

Q What is John's last name?

A John -- oh. Goodness gracious. There you go.

You're getting me on a senior moment again. Hart.
Q John Hart. And can you remind me what Larry's last name was?
A Batton.
Q Larry Batton and John Hart. So Larry Batton and John Hart are the people who actually looked inside the Auto Appraisal Group database, is that what you're saying?
A Yes.
Q And they are not -- Larry and -- sorry. What was the other gentleman's name? John?
A John.
Q Larry and John were not disclosed or referred to in your report, correct?
A No. Because they were just providing me information, and it was up to me to do the determination of where that value should land.
Q Right. And you relied on that -- you relied on that information to come to your conclusions, correct?
A It helped, yes.
Q Okay. And --
A It wasn't solely -- I mean, I -- I've looked at different places online and --
Q Well, I'm not asking for -- if you solely

relied on that information. I'm just asking whether you relied on it?

A Yes.

Q Okay. So you relied on that information from the database that John and Larry provided you in coming to your conclusions, correct?

A Yes.

Q But you don't -- you didn't personally review those underlying transactions and you can't identify those underlying transactions that they provided you specifically, correct?

A No.

Q You're saying you cannot do that, correct?

A Correct.

Q Okay. But -- so you can't name a single auction sale, private sale, or dealer listing of a Porsche 914/6 or 911 engine of this type that supports the damage range, specifically you cannot name a single sale, correct?

A Correct.

Q And your report doesn't cite a single comparable engine sale anywhere, correct?

A Correct.

Q And your report doesn't cite a single comparable vehicle sale, correct?

A Correct.
Q Is the $100,000 plus difference between the with-engine and without-engine values based on any market data specific to this type of engine, or is it based on something else?
A Based off of what I was able to see, what that 911 block, cylinder heads, intake, carburetors, and the receipt where it was built.
Q And the value, though, the market-specific value data that you said you were able to see, what was that data that you were able to see?
A It was where people had sold 911S engine blocks and heads, everything that it takes to put one of those together.
I was not able to find a single engine complete. I was able to find engines in pieces, and I was able to find partial engines, which all would have to be built.
Q Okay. And are you saying that you were able to find these pieces of this engine that were sold and that you had prices on those sales?
Is that what you're saying?
A Yes.
Q And did you add those prices together to reach your range, between the $100,000 plus range?

A That and looking up labor rates and -- and labor manuals to see what was involved as far as the machining and assembly and all of that to get that engine in one piece and make a complete motor out of it.
Q Okay.
A And then the receipt that he had for having it built helped tremendously.
Q Okay. And I -- and I understand the receipt. I want to focus on the parts that you just referenced, the engine parts.
You said that you were able to look up the value of those component engine parts, correct?
A The values that I were getting were retail values, but not certified sales. And that's the list -- if you look at the websites on the parts list, you can go to that and look those up on that website -- on those websites.
MR. CROGHAN: Okay. I'm going to ask the court reporter to share Exhibit 4 and to mark it as Exhibit 4.
That's the parts value that you provided.
(Exhibit 4 marked for identification.)
THE PROCEEDINGS OFFICER: One moment. Your old exhibit's up here. Okay. Got it. Just one moment.

BY MR. CROGHAN:
Q Mr. Youmans, I believe the court reporter, if she hasn't already, is marking Exhibit 4.
And this is the parts value report that you did, correct?
A Yes.
Q Okay. And it lists on the bottom of page -- sorry. On the bottom of page 1, it listed -- it lists a number of engine parts, correct, on page 1 into page 2, right?
A Yes.
Q Are those the engine parts we've been discussing?
A Yes.
Q Okay. And you said that if I go to these websites, I will be able to find those values.
Is that what you said?
A Yes.
Q So are you -- are you saying that for each one of these parts, you searched for those -- what -- you searched on those websites to see how much they were being listed for sale?
A Yes.
Q Okay. And --
A And some -- some of them on the eBay website,

they were actually older listings, and they were -- they were not up for sale anymore. They actually had already been sold, but they had prices on them.

Q Okay. And were you looking at -- some of them were sold, but some of them were for sale currently, correct?

A Currently, yes.

Q In 2026, correct?

A Yes.

Q But your value was a 2021 value, right?

A Yes. Because I had to look. Some of the stuff they had was new OEM parts, which are going to be the highest. Some of them are marked usable used. Those are going to be middle range. So --

Q And when you say "them," do you mean the Samojens or the people who are listing these parts online?

A The people who are listing them.

Q Okay. And --

A So that first one where the 2.5-liter pistons and cylinders, you can find those all the way from brand new reproductions to OEM in a box that've never been used to used parts. There's a value for each one.

The ones that were used in the used engine would have been usable used parts. So I adjusted the

value to what that should be.

Q Okay. And in -- do you --

A (Indiscernible - simultaneous speech.)

Q That figure of $6,000 -- and we're looking at the first bullet point on page 1 of Exhibit 4, engine parts, 2.5L pistons and cylinders, correct?

A Mm-hmm.

Q It says $6,000, right?

A Yes.

Q Can you tell me which website you found that value on and what -- and who was selling it and when the sale date was?

A There was on -- that was on three different websites. That would have been the MAR Motorsports, eBay Motorsports, and Heritage Parts of United Kingdom.

Q How do you remember that? Do you have notes?

A No, that's just -- I remember looking at each one of them up, and it took a long time to find those kind of parts.

Q But so you had specifically found those parts listed on those three websites. That's your testimony, right?

A Comparable, yes.

Q And you relied on those listings on those websites, correct?

A Yes.
Q In forming your evaluation? You relied on those listings on those websites to form your evaluation, correct?
A Yes.
Q But you did not identify the specific listing on those websites in your report, correct?
A No. (Indiscernible - simultaneous speech.)
Q And that is -- and that is true for all of these values on your parts value list in Exhibit 4, correct?
A Yes.
Q What you did was you told us that you -- which resources you consulted: MAR Motorsports, eBay Motorsports, PMB Performance, AASE Sales, Heritage Parts Centre, and discussions with machinists and a Porsche mechanic.
You identified generally that that was the resource that you used in this list, correct?
A Yes.
Q And then -- but you did not specify or identify or provide me in this report with any specific listings for any parts, correct?
A No. There's only one part that you could actually nail down to the exact one, and that's the 930

Turbo aluminum case, because it's got a serial number, and if you Google that serial number, it'll pop right up.

Q Okay. But not -- everything else you were estimating based upon what you could find on those websites, is that what you're saying?

A Yes.

Q And again, though, you didn't provide in your report any specific listings that verify and validate the numbers you put in here, correct?

A Correct.

Q I'm just taking you at your word that you found these on the websites somewhere, right?

A Yes.

Q Okay. Did anyone; Mr. Tony Samojen, Chris Samojen, or Mr. Cook, propose or suggest either the $215,000 figure or the $240,000 figure or the range itself before your report was finalized?

A No.

Q Were you specifically asked to provide a value for this engine alone, separate from the vehicle as a whole?

A No, not separate. I was told that engine was in that car, and so I provided a value as of the engine in the car and the engine not in the car.

I was not asked that, but I was told that engine was in the car and I was supposed to get an evaluation of the car as it was in December of '21.

They're telling me the engine was in the car, so I added that. But my valuation on the car is 115,000.

Q Okay. So I'm asking you whether you were instructed to provide an estimate value for the engine --

A No.

Q -- that was in the Porsche 1543? Okay.

A No.

MR. CROGHAN: I'm going to have the court reporter share with you Exhibit 10, and I'm going to ask her to mark it as Exhibit 10.

(Exhibit 10 marked for identification.)

BY MR. CROGHAN:

Q And once she does that and brings the document up, I'm going to ask you to scroll down to the bottom of the second page of the email.

A Oh. Come on. Okay. I'm on the second page. Okay. What am I looking for?

Q The email on the bottom of the second page from Trevor Cook to sales@autoappraisal.com.

A Okay. Okay. I see the one about a subpoena.

I see the one --
Q I'm at-- there's a -- do you see Chris 699 on the bottom right on page 2?
A Chris 0698.
Q Yeah. Can you go down to the second page, 699, the bottom of page 2?
A Doesn't appear I can. Let's see. Oh. Got it. 699. Okay.
Q Yeah. See where it says -- where Trevor Cook writes on May 13th:
"Hi Tom, I forgot to mention something I just remembered when speaking with Chris. In the report, please provide an estimated value for the engine alone of Porsche 1543 as described."
Do you see that?
A I see that.
Q Does that refresh your recollection whether you were asked to provide a value for the engine alone?
A I obviously didn't do my job.
Q What's that?
A I said I obviously didn't do my job because I didn't provide an engine value by itself.
Q But you did provide in Exhibit 4 -- in Exhibit 4, you did provide value of the engine parts.
And in -- in Exhibit 2, which is your

parts kit list was given to me. The parts list that was supposed to be on the GT tribute car was given to me. When I inspected the GT tribute car, those parts were on the car, except for the engine.

But the oil cooler, the struts, the brakes, the wheels, the dash, the hood, the fenders, the roll bar, all of the components that are listed in that homologation, they were there.

Q Okay. So if I'm looking -- if I'm looking at your -- if I'm looking at Exhibit 4, your parts value report, which lists over -- the first three -- let me -- let's look at Exhibit 4, if you -- if you don't mind.

The first three pages have a number of bullet points identifying engine parts, brakes, body parts, and miscellaneous parts, and they have values associated with each one, correct?

A Yes. Those are all loose parts. Those were not on the car.

Q Okay. So those are loose parts?

A Yes.

Q And those loose parts on pages one through three, those parts were loose, meaning that you did not physically inspect them, correct?

A No. That was off descriptions and pictures.

Q Okay. And what about the parts that were on

the vehicle? Did you value the parts that were on the vehicle itself, or was that just part of your evaluation of the vehicle?
A It's part of the evaluation of the vehicle.
Q You did not -- you did not -- sorry.
A If it's attached, it's part of the vehicle.
Q You did not separately value any parts that had been added to the vehicle, right?
A No.
Q Okay. Understood. Every -- I see some characterizations in your report of "new old stock," such as "genuine ZF LSD, tested and certified okay."
All those characterizations came from either Mr. Samojen or his counsel, correct?
A Yes.
Q And you were not able to independently verify those descriptions, correct?
A No.
Q If any of those descriptions were inaccurate, would your value conclusions change?
A Yes.
Q Okay. You consulted vendors, but you described the parts to them using Mr. Samojen's descriptions, correct?
A Correct.

Q You didn't show them the actual parts, right?
A No.
Q Okay. And we talked about comparable sales a little bit earlier, but I have a few more questions about that.
You testified that you consulted with two gentlemen at Auto Appraisal Group, John and Larry, regarding comparable sales, but you don't know today and you can't identify any specific comparable sales that supported your valuation, correct?
A Correct.
Q And your reports do not identify any specific sales that support your valuations, correct?
A Correct.
Q Have you seen the expert report prepared by Mr. Edwards' expert, Mr. Oleksiak?
A No.
Q Okay. So you are not aware that his reports identify specific comparables by name, auction house, date, and price?
A No.
Q Okay. Well, without specific identification and disclosure of the comparable sales, the trier of fact in this case cannot verify whether your market data actually supports your conclusions.

You would agree with that, right?
A Say it one more time.
Q Without disclosing the comparable sales that you used to validate your valuations, the trier of fact in this case, the judge or the jury, cannot verify whether your market data actually supports your conclusions, correct?
A Correct.
Q Your evaluations and your reports do not state that they are compliant with USPAP, correct?
A Correct.
Q Did you make any extraordinary assumptions in your reports?
A No.
Q Do you know what the term "extraordinary assumptions" means?
A Guessing.
Q You're guessing?
A Guessing. No, we didn't guess on it.
Q Okay. Did the collector car market change between 2021 and 2026?
A The value ranges on things did, yes.
Q When Mr. -- when -- and you mentioned John, a gentleman by the name of John and a gentleman by the name of Larry at Auto Appraisal Group, who you consulted

with.

As they looked at Auto Appraisal Group's internal market data figures as part of your consultation in arriving at comparable sales, right?

A Correct.

Q Do you know, as you sit here today, whether they were looking at sales from 2021 or 2026?

A Yes. They would tell me -- if they had a comp, they would tell me when that was done, when that inspection was done, and what value they came up with.

Q Right. But --

A It could be condition, year, make, model.

Q Right. But as we -- as we covered earlier, you can't actually identify the specific comparables, so you can't tell me specifically what the dates were, correct?

A Correct.

Q Okay. Did you have any written protocols governing which comparables you would include in your analysis and which ones you would exclude?

A No.

Q Did your parts value report distinguish between new old stock parts, reproduction parts, and used parts?

A On the parts list?

Q Yes.
A I believe it -- some of them did, but not all.
Q Okay. So you're not able to identify for each part in the report, every single one, which of those three categories the part would fall into?
A Correct.
Q And the value of a given part would differ materially depending on whether it's new old stock, a reproduction, or a used part, correct?
A Well, there's one in here. OEM glass. Oil cooler, still wrapped in the factory packaging. There are some of them -- some of them, but not --
Q Let me -- let me ask again. Yeah.
But not all, right?
A Right.
Q Let me ask again. This is a more general question.
Does the value of a part differ materially depending on whether it is new old stock, a reproduction, or a used part?
A All parts are supposed to be built to an engineering spec, but it's widely known that an original equipment manufacturer part made by Porsche or Ford is going to be somewhat more detailed and better than a -- a reproduction part.

A No.
Q Okay.
A He wouldn't have got anywhere with that.
Q Mr. Cook said he was haranguing the sales guy, Tom. Do you know who Tom is?
A Yes. He's one of our sales representatives that he -- basically, him and Corbin, they're the first line.
They're the people that answer the phones and then try to direct people to the right appraisal, what type of appraisal they need.
Q Are you surprised to see in this email that Trevor said he was haranguing your sales guy, Tom?
A No. Because I had originally set everything up to be done shortly after the GT40 was done. In fact, I had planned to leave California and fly right to Arizona. And that got canceled.
And so another date got set up, and I had all my reservations; hotel, car, plane, everything, set up to go. Had the shop set up to be fine while I was gone. And at the last minute, that got changed.
And then I was told that we had a hard date that we needed to try to get this done by. And I had not even inspected the two Porsches.
So once I got out there and got that, I had to

get busy getting this done. And it's probably me dropping the ball.

I probably didn't communicate enough with Mr. Cook, and he was getting anxious, and so he was calling Tom to rattle my tree and want to know where his stuff was. So it didn't surprise me none. No.

Q Okay. So this supplement in Exhibit 5 -- who -- this is -- these supplemental opinions go beyond just the value of the cars, right?

A Yes. There's an opinion in there about them.

Q There's no valuation in the supplement, right, Exhibit 5?

A No.

Q Who determined the scope of those supplemental opinions that you would include there?

Was this your decision, or did counsel ask you to put this in there?

A No. He didn't ask me to actually put it in there. He asked me when we did the reports that he needed a cover letter describing what these cars are.

And we -- we do this a lot for pre-purchase people. If it's -- it's a Le Mans Sport and it's got GTO on it, they want to know what it is and why. Same -- I mean, we get that all the time, but --

Q And did you -- this supplement here does not

identify any information that was used to create it.
Do you have any sources of information that you used to come up with this information, or is it just general -- your general knowledge?
A Just general knowledge. That's from experience. I've been doing it for years.
Q Okay. But there's nowhere that I can look to verify that data that you objectively used?
A No.
Q Okay.
A No. I mean, you could -- you go online and you can look up the homologation process like NASCAR or FIA, any of the racing cert people, and it'll explain all of that, the uses of -- the terminology of Gran Turismo.
You can look -- look those up and, I mean, it explains all that stuff. Pretty much, that's all I'm doing is explaining what that is.
And he was wanting to know, you know, when we do these inspections, he wants cover letter describing what we did.
And so the first -- the first one I typed up was half that long, because I didn't -- I didn't go into depth about all the different styles of cars. But I realized that he was looking for a description of more

than what -- what I'd wrote down.

And so I tried to expound upon it a little bit.

Q But you're not a Porsche expert, right?

A No. I'm not.

Q Are you qualified -- are you qualified to make these opinions, or is this just something you found through researching online?

A This is general knowledge through all cars, not just Porsches.

Q Okay. Your report --

A The Ford I mentioned earlier.

Q Your reports use the term "fair market value," but you don't define that term, and you don't cite a source for that definition anywhere in the report, correct?

A Correct.

Q Are you aware that fair market value, as defined under the federal law, is a tax standard with limited application to evaluation like this one?

MR. COOK: Objection to form.

THE WITNESS: I don't understand what the ask is on that. I know --

BY MR. CROGHAN:

Q And did you --

A I know they use it for tax purposes, yes.
Q Did you apply any recognized standard of value, like tax, litigation, or otherwise, in reaching your conclusions?
A No.
Q Mr. Oleksiak, the expert for plaintiff, his report defines market value and cites specific regulatory source for that definition.
Did you know that?
A No. I have not seen his report.
Q Your reports describe your approach as a market data approach, correct?
A Yes.
Q Are you aware that the recognized industry term for that methodology is the sales comparison approach?
A No.
Q Whichever term is used, your reports do not identify a single comparable sale, as we already discussed, right?
A Correct.
Q Mr. Oleksiak's report expressly considers three recognized approaches to value; cost, income, and sales comparison, and explains why he selected the sales comparison approach for this assignment.

Your reports do not describe those three approaches or why you chose the approach that you chose, correct?

A Correct.

Q Do your reports discuss the vehicle's style, condition, rarity, utility, provenance, or scale, the recognized characteristics that drive value for collector vehicles?

A Briefly.

Q Okay. For Porsche 1543, your report does not discuss what makes a GT spec vehicle more or less valuable, such as engine type, build quality, or otherwise, correct?

A Correct.

Q For Porsche 011, your report describes it as one of the first 914s produced in late 1969 for 1970, but it provides no evidence to support that claim, correct?

A Correct.

Q For the 4GT, your report does not discuss how mileage or originality affects the value, correct?

A Correct.

Q Do your reports disclose any hypothetical conditions or extraordinary assumptions that you made and their effect on your value conclusions?