# EXHIBIT G

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

---

JAMES EDWARDS,
Plaintiff,
-vs- CASE NO.: 25-CV-8174-SPL
TONY SAMOJEN,
Defendant.

---

Video Examination of CHRIS SAMOJEN, taken at the instance of the Plaintiff, under and pursuant to the Federal Rules of Civil Procedure, pursuant to Notice of Deposition, before SHERYL L. STAWSKI, a Registered Professional Reporter and Notary Public, in and for the State of Wisconsin, taken via Zoom videoconference, on the 12th day of August, 2026, commencing at 8:23 a.m. PDT and concluding at 4:33 p.m. PDT.

A P P E A R A N C E S

McDONALD HOPKINS, LLC, by
MR. LUCA GIOVINE
300 North LaSalle Street, Suite 1400
Chicago, Illinois, 60654
Appeared on behalf of the Plaintiff.

SILENCE LAW GROUP, by
MR. TREVOR COOK
20235 North Cave Creek Road, Suite 104 #460
Phoenix, Arizona, 85024
Appeared on behalf of the Defendant.

Videographer: Mr. Ross Colby, Veritext Legal Services.

EXAMINATION BY: PAGE


| EXAMINATION BY: | PAGE |
|---|---|
| MR. GIOVINE | 5 |
| MR. COOK | 256 |
| MR. GIOVINE | 264 |
| MR. COOK | 296 |
| MR. GIOVINE | 303 |
| MR. COOK | 304 |


REQUESTS:


| REQUESTS: | |
|---|---|
| By Mr. Giovine - Email with Harv Falkenstine | 255 |
| By Mr. Giovine - Hard Drive Downloads | 263 |

# I N D E X

EXHIBITS:


| | MARKED | ID |
|---|---|---|
| Exhibit 1 - Combined Subpoena | 15 | 16 |
| Exhibit 2 - Partial List of Automotive Events | 65 | 65 |
| Exhibit 3 - Email, 10/20/21, from Morse to T. Samojen | 72 | 72 |
| Exhibit 4 - Defendant's First Amended and Second Supplemental Responses to Plaintiff's First Set of Interrogatories | 89 | 89 |
| Exhibit 5 - SMS Export Text Messages | 96 | 96 |
| Exhibit 6 - Timeline | 128 | 130 |
| Exhibit 7 - Email, 10/2/21, from Edwards to T. Samojen | 136 | 136 |
| Exhibit 8 - Emails, Chris 122-123 | 139 | 139 |
| Exhibit 9 - Email Agreement | 140 | 140 |
| Exhibit 10 - Emails, 10/30/21 and Window Sticker | 156 | 157 |
| Exhibit 11 - Emails, Chris 385-391 | 171 | 172 |
| Exhibit 12 - Emails Re Carney, Chris 392-399 | 178 | 178 |
| Exhibit 13 - Email, 11/1/21 from Morse to Edwards | 199 | 199 |
| Exhibit 14 - Emails 2021 | 201 | 202 |
| Exhibit 15 - Emails 2025 | 212 | 212 |
| Exhibit 16 - SMS Export Text Messages Chris 162-189 | 215 | 216 |
| Exhibit 17 - Text Messages | 238 | 239 |
| Exhibit 18 - AI Draft, Chris 29-30 | 239 | 240 |
| Exhibit 19 - AI Prompts and Drafts Chris 885-887 | 241 | 241 |
| Exhibit 20 - Emails, 3/27/26 re Ford GT Receipts | 252 | 252 |
| Exhibit 21 - Email, 3/25/26 from C. Samojen to T. Cook | 253 | 253 |
| Exhibit 22 - Youmans' Report | 274 | 274 |

TRANSCRIPT OF PROCEEDINGS

THE VIDEOGRAPHER: Good morning. We are going on the record at 8:23 a.m. on August 12th, 2026.

Please note that this deposition is being conducted virtually. Quality of recording depends on the quality of camera and internet connection of the participants. What is seen from the witness and heard on screen is what will be recorded.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit one of the video recorded deposition of Chris Samojen taken by counsel for the plaintiff in the matter of James Edwards versus Tony Samojen, filed in the United States District Court for the District of Arizona. Case Number 3:25-CV-08174-SPL.

This deposition is being conducted remotely using virtual technology. My name is Ross Colby representing Veritext Legal Solutions, and I am the videographer. The court reporter is Sheryl Stawski, also from Veritext.

I am not related to any party in this

action nor am I financially interested in the outcome. If there are any objections to the proceeding, please state them at the time of your appearance.

Counsel will now state their appearances and affiliations for the record beginning with the noticing attorney.

MR. GIOVINE: Good morning, everyone. This is Luca Giovine on behalf of the plaintiff.

MR. COOK: Trevor Cook. I represent Defendant Tony Samojen and, for purposes of the deposition, Chris Samojen.

THE WITNESS: Chris Samojen, the witness.

THE VIDEOGRAPHER: Thank you. Will the reporter please swear the witness.

CHRIS SAMOJEN, called as a witness herein, having been first duly sworn on oath, was examined and testified as follows:

EXAMINATION

BY MR. GIOVINE:

Q Good morning, Mr. Samojen. As we met off line, my name is Luca Giovine. I represent the plaintiff in this case.

How are you doing today?

conversations with your lawyer relating to this deposition, I don't want to know about those conversations.
A Okay.
Q So I don't want to know about, you know, if Trevor is helping you prep for this deposition, and he's representing you for this deposition. Any advice that he gave in that context, I don't want to know about; so just to make that very clear at the outset.
A Okay.
Q So what specific extraction software did you use?
A I would have to look that up. I don't recall.
Q Okay. And you mentioned, you know, you used some search terms; the 914, GT, Porsche.
Is there anything else you can think of that you used?
A Well, that was -- to clarify, that was for Gmail.
Q Okay. Did you perform text searches for text messages as well, or you just went through --
A I just went through the entire time period and pulled out anything that was pertinent to this case.

Q Okay. And now scrolling down to Exhibit 1 to
page 7.
A Okay.
Q This is the revised subpoena with the correct deposition date and time for today's date. And right in the middle there, there's a section that's checked off that says "Production," and it requests "All AI prompts and corresponding transcripts created relating to the above-captioned litigation." Do you see that?
A I do not. What page are we on?
Q We're on page 7.
A Oh, I see. Where the checkmark is?
Q Right.
A Where -- I see "Production" -- Oh, "All AI prompts corresponding..." yes.
Q I know that your counsel provided us with some PDFs last night responsive to this request, and I do believe that he sent us something this morning before the deposition regarding the actual links to those AI prompts and corresponding transcripts.

And so -- and so my question is, is it your understanding that the list that was provided to us by your counsel is a complete

list of all AI prompts and transcripts that were created relating to this litigation?
A Yes, that is correct.
Q Okay. And, to your knowledge, have you actively withheld anything responsive to either this subpoena or the prior subpoena?
A No, I did not.
Q All right. So we talked a little bit about Tony Samojen. And, by the way, throughout the deposition do you mind if I call you Chris?
A Yes, please.
Q And the reason I ask is because, obviously, you and your father have the same last name. I don't want to start saying Mr. Samojen and then get confused.
So throughout the deposition I'll refer to you as Chris, and I'll refer to your father as Tony. Is that fair?
A Yes.
Q Okay. So, you know, we mentioned that you moved here -- excuse me -- you moved to California to take over and help with Tony's business, the carwash business; is that correct?
A Correct.
Q When's the last time that you resided with Tony?

A I did -- we did move out here, and our home did not close in time. It closed about a month later, I believe. So myself, my wife and our three children did live temporarily with my dad for about three weeks, and that was in June of 2021; and we closed on our house on July 7th.
Q How far away do you live from your father?
A Roughly 10 to 12 miles; 25 minutes away depending on traffic.
Q And I know you mentioned the carwash business. Does your father own other carwash businesses?
A No.
Q Does he own any other types of businesses?
A No.
Q Has Tony previously owned any businesses?
A Not that I'm aware of.
Q As far as -- well, strike that.
How long has Tony owned the carwash business?
A Approximately 40-plus years.
Q And has that always been Tony's sole source of income?
A Yes.
Q And I know that, you know, Tony is obviously interested in cars. Does he sell cars as -- as

part of a business venture, or is that more of a hobby of his?
A It's just a hobby.
Q All right. And I know you mentioned that you kind of are -- you've taken over the carwash business.
Have you consistently been involved in helping Tony in his, you know, business endeavors specifically at the carwash even before you moved to California?
A I didn't help as much when I was out of state. I did help before we moved to Texas, but it's been a 50/50 partnership since I came back to California.
Q Okay. And before you moved to California, what -- what kind of things did you help your dad with on the business?
A I guess really nothing much on the business. I was kind of focused on my own career.
Q Okay. So you never, you know, helped him out with secretary of state filings or communicating with customers or anything that potentially would involve that carwash business?
A No, the only time I started helping is in 20 -- late 2019, 2020 when we started talking about

BY MR. GIOVINE:
Q Okay. Let's -- tell me a little bit more about that.
A I mean, to that car that -- my oldest memories are -- of my dad -- are in that car driving with him; so it was always a special car that we enjoyed.
Q Are we talking about the 1543 now?
A Yes, 1543.
Q But I think you discussed earlier that the -- the more special car to you and to your father was the Porsche 11?
A The more valuable car, yes.
Q Okay. So sentimentally the Porsche 1543 was more valuable. Is that what you're saying?
A Sentimentally I would say that car was more valuable to me.
Q Okay. And so -- and you mentioned this was the first time that you heard of any interest in someone purchasing the Porsche 1543; is that correct?
A That is the first time that I've ever heard of a possible purchase of 1543, yes.
Q And to your understanding, is that because Tony never offered it for sale or because, you know,

as we discussed earlier, people just weren't that interested in the car?

MR. COOK: Objection.

THE WITNESS: I don't recall him ever offering the car for sale.

BY MR. GIOVINE:

Q Okay. Did you upon learning that your father was potentially going to sell both the Porsche 11 and the Porsche 1543, did you discuss with your father what you thought the value of the cars to be and what he should offer as a price for the cars?

A I did not discuss the value with him. He discussed potential values to me.

Q Okay. And what did he tell you about the values?

A I believe it's in one of the text messages where he said 600,000 for 01, and he believed the value of 1543 to be around 400,000.

Q Okay. Were you involved at all in the negotiations between Jim and Tony?

A I was not involved in the phone conversations that they had. I was present during the final negotiations when my dad and I were at Jim's house in his Arizona home.

Q Okay. We'll get to that in a second.
As far as the -- in between the October 24th, 2021 visit and your all's visit to Jim's house thereafter, in between that time frame did you have any involvement in any negotiations between Jim and Tony?
A No, I did not.
Q Did Tony frequently call you during that time period to discuss, you know, what the negotiations -- state of the negotiation were and the details of the negotiations?
A There wasn't too much conversation. We talked about the one with the text he sent, and there was another text, like, let's go to Arizona and check out the Ford GT and -- oh, there was one, however, where we're talking about -- my dad said, yeah, might be a deal for both cars.
I'm like, oh, well, he's a big car collector, I believe he told me, and said what -- did he happen to have any Ford GTs as we had interest in Ford GTs. That was the part I -- I had an involvement in.
Q Okay. So this was at some point after the October 24th visit you had discussed with your father the potential of seeing if Jim had a Ford

GT to trade for?
A Yes.
Q Okay. And how long before this transaction were you and your father interested in acquiring a Ford GT?
A Vaguely a month or two, I believe --
Q Okay.
A -- because I saw on his text, on the page you have right now, on October 5th -- 25, we were tracking one on Bring a Trailer, one that the actor Tim Allen owned; so it was within a month or two that we were thinking about acquiring a GT.
Q Okay. And let's turn back to that exhibit then since you brought it up. We're on Chris -- we're on Exhibit 5, Chris 246. Is that what you're looking at?
A Two-forty -- yes, the top text?
Q Yes. And you mentioned, "You should also reach out to Jim and see if he has the new GT in his collection that you could trade for instead."
A Yep.
Q And that was sent October 25th, 2021?
A Yes. That was my involvement with the deal.
Q Okay. Did you speak directly to Jim at all

about -- during this time period about potentially including a Ford GT into the transaction?
A No.
Q Okay. And then it looks like at the bottom of the page, 246 -- Chris 246 -- your dad responds, "Ford GT on bay 29 K miles New York."
Do you see that?
A Yes.
Q And then going on to the next page, you said, "Yeah, I saw that red one. Curious to see what one with 'high' miles goes for."
Do you see that?
A Yes.
Q Okay. So at some point between October 25th and October 28th when this new conversation started, you had discovered that Jim had a Ford GT available, correct?
A Yes, we had discovered that.
Q Right. And the Ford GT that you discovered that was available is the Ford GT that's at issue in this lawsuit, correct?
A We were brought to that attention through Kerry Morse that said, yes, he does have a 2006 Ford GT that could be available as part of this deal.

Q Okay. So then these text messages at the end of Chris 246, going on to Chris 247 on October 28th, 2021, those are basically a back and forth between you and Tony about looking up different 2006 Ford GTs and trying to find comps to see kind of what the value of the car was. Is that fair?
A No, that's not correct. We are -- I believe we were looking at acquiring a GT with or without Jim already, so we were looking at getting a fair market value of current cars; and this Ford GT was -- this 29,000 is a high-mileage car for a Ford GT.
Q Okay. So the one that's "on Bay," is that what you're referring to?
A Yeah, I believe that was eBay, but I don't recollect.
Q Okay. And so this is not pertaining to the Ford GT that is at issue in this lawsuit. This is pertaining you all potentially purchasing a separate Ford GT, correct?
A Correct.
Q The -- the research that you did and your father did relating to other Ford GTs, did that help at all -- assist you in negotiations with Jim in

Q Please take your time.
A I can't recall everything that happened here because it's weird that (d)(iii) is missing, and it was just the early stages of building out a timeline; so there might be some stuff that's missing or might be different.
So I'd say this isn't the most accurate timeframe.
Q Is there anything just from looking at this timeline that you would add in addition to what's stated here?
A Oh, I'd have to spend a lot more time reviewing it and looking at everything before I would add or remove items on that. Little difficult to do on the spot.
Q That's fine. You can take as much time as you need.
MR. COOK: Just interpose an objection to the last question.
THE WITNESS: I'm not sure what you're looking for because I can't give you an answer on the spot what I would change right now.
BY MR. GIOVINE:
Q I'm not necessarily looking for anything.

A Okay.
Q This is a timeline that was drafted by you, correct?
A Yes, but almost a year ago.
Q This is a timeline drafted by you, correct?
A Correct.
Q And you've already told me in reviewing the document for less than a minute that one of the statements in this timeline is inaccurate, correct?
A Yes, one -- one item.
Q Right. Is there anything else in this timeline that you perceive to be inaccurate?
A I don't know what my thoughts were on "C(i)(2)(b) subject: 914-6 GT - pictures and spec sheet." I mean, do we have a time stamp on that? I don't know what email that's referring to. I think that's the GT spec sheet that was emailed. I don't see anything else that stands out abnormal.
Q Okay. So it looks like from the timeline the -- Jim returning to Tony's house on October 24th, 2021. That's missing from this timeline, correct?
A That is, yes.

Q And we discussed that -- that day to the best of your knowledge in detail prior to the break, correct?
A We did.
Q Looking at (c) the date of the timeline is "10/30/2021." Do you see that?
A Uh-huh.
Q Number (i)(2) it says, "Jim said thank you for everything, and asked if Tony had window sticker."
A Yes.
Q So on September 12th, 2025, you acknowledge that on October 30th, 2021, that Jim asked Tony for the window sticker; is that correct?
A Yes. We saw that email.
Q Okay. And it looks like on October 31st, 2021, it says, Jim asked about exploring deal for 11 plus 1543 plus all GT and Porsche racing parts. Do you see that?
A Yes.
Q Are you saying here that this is the first time that Jim asked about the 1543 and GT -- or excuse me -- and Porsche racing parts?
A No, I don't think I'm saying that at all.
Q Okay. And then on November 1st you -- you and

Tony flew to Show Low and visited Jim.
Do you see that?
A Yes.
Q And we talked about, you know, the fact that you all test drove the Ford GT?
A Yes, my dad and I test drove the car.
Q Jim drove you back to the airport; and you discussed, you know, the deal and the pricing for the cars, correct?
A Correct.
Q All right. And then it looks like on November 1st, 2021, subsequent to that, "Jim emailed Tony the purchase agreement." Tony signed, scanned and faxed back same agreement; is that correct?
A I believe so.
(Exhibit No. 7 was marked and shared.)
BY MR. GIOVINE:
Q All right. I'm going to introduce what's marked as Exhibit 7. This is Chris 113.
A Okay.
Q This appears to be an email from James Edwards jge@reagan.com to Tony Samojen, tesamojen@msn.com on November 2nd, 2021 at

12:04 p.m.; is that correct?
A Yes.
Q All right. And the -- the email states, "Tony, good chatting this AM. I wanted to confirm that you were good with the deal. Car deals aren't worth doing unless both parties are good."
Do you see that?
A I do.
Q This was sent the morning of November 2nd, 2021; and per the timeline we just looked at, it looks like you mentioned that the purchase agreement was signed November 1st, 2021.
And we're going to get into the purchase agreement in a second; but my question is: After Jim sent you the purchase agreement, were there any other communications between you, Tony or Jim regarding the purchase agreement?
MR. COOK: Objection; foundation.
THE WITNESS: There was no communications between Jim and I once we left his house.
BY MR. GIOVINE:
Q And that's a good point because what I'm looking on here is that this was from Jim to Tony, and I don't see you copied on the email; and yet it's

Jim asked for a copy of the original window sticker, correct?
A Yes, we did see that email where he received that.
Q Right. But you know for certain that your dad received that email, correct?
A Yes, I saw that email in his inbox -- or in his Outlook folder.
Q Okay. Let's look at -- let's look at Exhibit 10 again, please. Looking at the last page, JE 13.
A Okay.
MR. GIOVINE: I'm not still sharing my screen, am I?
MR. COOK: No. No.
BY MR. GIOVINE:
Q Okay. So we agree that this was the PDF that was attached to Exhibit 10, right?
A Yes, this PDF was attached to Exhibit 10.
Q Okay. And walk through with me -- actually, strike that. Let's go through it together. It says here "Make, Porsche," correct?
A "Make, Porsche," correct.
Q "Model 640 6 36 901.26." Do you see that?
A I do.

Q What's a "Model"?
A Make and model. Make is always manufacturer, and model is the model of the car which is a 914.
Q Right. I guess my question is -- you know, I'm a layperson who doesn't know about cars, so when I say make, Ford; model, Mustang -- right -- this is a numeric description. I'm just curious why this is numeric description as opposed to a --
A I have no idea what that could be. That goes beyond my scope of understanding.
Q Okay. And the year is 1970?
A Yes. I see that.
Q And the serial number on this Porsche is "9140431543," correct?
A Correct.
Q And we established earlier that's the -- the correct number for the Porsche 1543?
A Correct.
Q And when it says "Body Type," it says "914-6 R," correct?
A Yes. I see that.
Q And if we look, there's information on the "Distributor," and a "Dealer Name" as well as

some other accessories that are listed on the vehicle, correct?
A Yes.
Q Okay. So we talked a little bit about a Porsche that has -- that's a factory GT. We said that there's the Porsche that is a regular 914/6 with the kit parts -- with the official kit from Porsche; and there is also the 914/6 that can be modified into a GT via miscellaneous kit parts; is that correct?
A Yes, those are the three tiers broke down.
Q And those are all different subsets of GTs under the 914 sets, correct?
A Subsets.
Q Probably a poorly worded question. I'll withdraw.
A Yeah, I'm not following that one.
Q Sure. You mentioned earlier there's a small amount -- I believe you said 11 factory GTs that were created by Porsche for the 914/6 model; is that correct?
A Yes, the 914 GT Factory Works cars you're referring to?
Q Yes.
A Okay.

Q Isn't it true that those models are often referred to internally as a 914/6 R?

MR. COOK: Objection; foundation.

THE WITNESS: What we discussed is the internal factory race department would describe -- or refer to those as R cars.

BY MR. GIOVINE:

Q Okay. So the 946 -- 914-6 R designation is known as being a designation for factory GTs for the 914-6 model, correct?

MR. COOK: Objection to form and foundation.

THE WITNESS: That's incorrect because you're implying that it was used outside of the internal designation, and that was not true.

BY MR. GIOVINE:

Q Well, I'm not -- I'm not really implying anything. I'm -- I'm just asking you a question which is the -- you agree that that was a designation used for factory model GTs, correct?

A I agree that they used that as an internal designation only.

Q Nonetheless, they used that designation 914-6 R to refer to factory GTs, correct?

MR. COOK: Objection; foundation.

THE WITNESS: No, that's incorrect. When they raced them, they were 914-6 GT Works cars.

BY MR. GIOVINE:

Q Well, that's not really what I asked.

A Well, what you're asking I say I disagree with.

Q That's fine. I understand what your position is here, and I don't think I'm going to change your mind here today.

I am just trying to ask you whether or not 914-6 R refers to a factory model GT, whether internally or externally?

A Internally, yes. Externally, no.

Q Nonetheless, they are referred to as 914-6 Rs, correct?

A Internally.

Q Okay. Do you -- well, strike that.

We talked a little about Kerry Morse earlier. Do you remember that?

A Yes.

Q Would you consider Kerry Morse an expert in Porsches?

A Yes.

Q Is he one of the leading Porsche enthusiasts,

authors, et cetera in the Porsche industry?
A He's very critical in the Porsche world.
Q Okay.
A That's -- that's all I know.
Q Okay. And that's exactly why your -- your dad trusted him to sell the Porsche 11 originally, correct?
MR. COOK: Objection; foundation and form.
THE WITNESS: I just -- I --
BY MR. GIOVINE:
Q Sorry for interrupting. Your dad loved that Porsche 11, and he eventually wanted to sell it. And who did he call? Kerry Morse, correct?
A Yes.
Q And he trusted him to sell that car, correct?
A He did trust him, yes.
Q And he would trust his opinion in helping him sell that car, correct?
A Yes, he would probably help him get the best value for that car.
Q Right. And he would do that because Kerry Morse really knows what he's talking about when it comes to Porsches, correct?
MR. COOK: Objection; form and

max and he thought 350 - if there is some merit to that window sticker, he might be right - a good donor." Do you see that?
A "A good donor," yes.
Q Okay. So Kerry Morse is asking Jim here -- he's communicating with Jim about conversations that he had with Tony, correct?
A Yes.
Q And he follows up saying that, you know, if there's merit to this window sticker, it might be a higher value than what Jim might think it is, correct?
A Yes.
Q And the window sticker at issue -- we're referring to the window sticker of the Porsche 1543, correct?
A Yes.
MR. COOK: Objection; foundation.
BY MR. GIOVINE:
Q And this email was sent a day after the email that was sent in Exhibit 10, October 31st, 2021, correct?
A Yes, it was sent on November 1st.
Q Correct. So that's correct, right?
MR. COOK: Objection; foundation.

THE WITNESS: I'm just looking at the email. It says November 1st sent.

MR. GIOVINE: Sure.

MR. COOK: Can -- can we confer off the record for just a moment?

THE VIDEOGRAPHER: You want to go off the record?

MR. COOK: Yeah, just real quick.

THE VIDEOGRAPHER: We're going off the record at 1:40 p.m.

(A discussion was held off the record.)

THE VIDEOGRAPHER: We are back on the record at 1:44 p.m.

MR. GIOVINE: Okay. So we talked a little bit about the authenticity of the email on Exhibit 10; and I feel like after today Exhibit 10 is going to be haunting me in my nightmares for how many times that I've said it here today, so I apologize in advance for that.

I'm going to mark another exhibit here.

(Exhibit No. 14 was marked and shared.)

BY MR. GIOVINE:

Q I'm marking Exhibit 14. This is JE 240 to JE 242. Let me know when you're ready, Chris.
A Go ahead.
Q So this looks like a continuation of the email chain, Exhibit 10; but this time it looks like it's from Jim, jge@reagan.com to Kerry Morse, kerryjmorse@gmail.com. Do you see that?
A Yes.
Q And when I say "a continuation" of Exhibit 10, the email that was forwarded was the chain and attachment from October 31st, 2021 with Tony stating "Enclosed 914-6 window sticker."
Do you see that?
A I do.
Q Okay. So my question to you is: It's your belief, generally, that your father didn't send this October 31st, 2021 email. Is that fair?
A I believe my dad did not send that window sticker, yes.
Q Okay. So what do you perceive happened with this alleged October 31st, 2021 email?
What is your explanation as to why this exists in discovery?
MR. COOK: Objection; foundation.
THE WITNESS: I still don't know why

this email is here. That's why Carney Forensics was confused and said they cannot do any more until they know the source of where those .eml files that your client provided came from.

BY MR. GIOVINE:

Q Okay. So you have -- strike that.

MR. GIOVINE: Madam Court Reporter, can you read that back for me, the answer?

(The above answer was read.)

BY MR. GIOVINE:

Q So you're unable to determine where these came from, correct?

A I do not know, yeah.

Q Okay. Carney Forensics was unable to determine where they came from, correct?

A Due to the source of the email files, they weren't -- what they said in that second paragraph that you didn't go into, they were showing that they need a third party to source the emails so they know the source of them, where they came from before they can do anything else.

Q Okay. But that avenue was never explored, correct?

A Not that I'm aware of.

Q Okay. And to the -- to that date of that email with Carney Forensics, the purported forged email was the most authentic of the emails they received, correct?

MR. COOK: Objection.

THE WITNESS: I think what you read in that first line of that email saying that these emails appeared correct in their current format or something along the lines.

BY MR. GIOVINE:

Q Right. And here's -- my question is, you know, we have that email. We produced that email. Now we have the .eml and the PDF. We have this email, Exhibit 14, where Jim forwards the email on Exhibit 10 to Kerry Morse, and I can pull up the .eml file, if you'd like.

We've got an email from Kerry Morse talking about the window sticker and whether there's merit to the window sticker.

And with all of that considered, because you are unable to find the email in your father's sent inbox, you don't know if this is a real email or not, correct?

MR. COOK: Objection.

THE WITNESS: I don't know if it's a

real email because we would have gone down the road a lot further with Carney Forensics.

They even looked at my dad's hard drive that he used during 2021, and they did not find any evidence of that email in the hard drive.

So based on those, we just don't know where that email came from.

BY MR. GIOVINE:

Q Right. So you tell me what your theory is as to what happened with this email.

A I don't know. Lost on all that. I don't know what happened.

Q Because, to be fair, in order for your theory to be true, right, Jim would have to have fabricated the email, correct?

A Right.

Q And he also would have fabricated the email to Kerry Morse, correct. This email here he would have had to fabricate it, correct?

A Which email are you referring to to Kerry --

Q Exhibit 14.

A That was --

MR. COOK: Objection.

THE WITNESS: I see the email.

THE VIDEOGRAPHER: Yeah, sure. We'll go off the record. The time is 3:34 p.m.

(A discussion was held off the record.)

THE VIDEOGRAPHER: We're back on the record at 3:39 p.m.

MR. GIOVINE: This is Luca Giovine on behalf of the plaintiff. Counsel and I discussed a matter off the record relating to a hard drive that was allegedly downloaded from the forensic experts that were hired by Chris and Tony, the defendant -- the defendant here.

And the plaintiff's position is that the -- any downloads from a hard drive would be responsive to discovery requests issued at this point in time, and that the defendant is under obligation -- under a continuing -- continuing obligation of disclosure -- disclosure and should disclose any downloads or data that was recovered from the defendant's hard drive, laptop, email, what have you, whatever was actually investigated into by the forensic expert.

And, for the record, I will state that these are not disclosed experts; so we will

stipulate to the extent that there were reports or analyses generated that were work product or protected by any privilege, that would not be incorporated in this request; but, nonetheless, the actual external hard drive downloads and email downloads or any other type of raw data that was extracted within that process should be produced to the plaintiff.

MR. COOK: The defendant's position -- well, the defendant appreciates the stipulation and the recognition of the work product protection. That's the first thing that the defendant would point out here, that these were consulting experts; never disclosed to testify or offer -- offer a report.

And the Federal Rule does not require disclosure of evidence unless its intended use is to support the claims or defenses in the case.

So to the extent that those -- those expert conclusions that we discussed in the deposition come out for whatever reason, plaintiff is free to argue against their admissibility to keep them -- keep them from coming out at trial; but that -- that would be

the proper forum to that.

Defendant doesn't recognize that there's any independent disclosure obligation here.

MR. GIOVINE: Okay. And then, for the record, Counsel and I will confer offline via email to discuss the matter further.

MR. COOK: Yes.

EXAMINATION

BY MR. GIOVINE:

Q All right, Chris, moving on back to the deposition here. You testified just now that you were not present when your dad gave documents or binders of any kind to Jim on October 23rd, 2021, correct?

A Correct.

Q But your dad told you that he gave -- he gave Jim those binders, correct?

A Depends on when -- we were talking about that. I mean, I believe the latest is he must have given them the binder on accident.

Q Right. And your father told you that he gave -- he gave Jim the binder on accident on October 23rd, 2021, correct?

A I believe so, yes.

Q Okay. You have no personal knowledge -- you just -- strike that.
You just testified that you have no personal knowledge of what Jim reviewed prior to the purchase agreement, fair?
A What he reviewed -- can you kind of open the question?
Q Sorry. Yes or no; did you just testify that you have no personal knowledge of what Jim reviewed, correct?
MR. COOK: Objection.
THE WITNESS: Yeah, what -- what falls under personal knowledge?
BY MR. GIOVINE:
Q Okay, so when your lawyer asked you this question five minutes ago, he simply said you have no personal knowledge of whether -- of whether Jim reviewed any documents before the sale.
A Oh, I said --
MR. COOK: Objection; mischaracterizes testimony.
BY MR. GIOVINE:
Q Do you understand my question?
A No, not really and --

Q Okay.
A Trevor asked me a little differently.
Q Okay. How would you like me to put it for you -- for you to be able to answer it? What is confusing about my question?
A I still don't understand what you're asking exactly, so if you can just try to make it as simple as possible. It's been a long day, and I'm getting a little tired.
Q Fair. All fair. To my credit, I'm also quite tired as well.
So we agree that your father told you that he gave Jim the binders on October 23rd, 2021, correct?
A Yes, I believe he did say that he gave him both binders, one on accident.
Q Okay.
A I believe that's what we agreed to.
Q Fair. We agreed on it. Okay.
But you don't know whether or not Jim actually reviewed the binders, fair?
A Yes, I don't know what he did in his hotel that night.
Q So you would defer to Jim as to whether or not he reviewed those binders, correct?