# EXHIBIT H

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

---

JAMES EDWARDS,

Plaintiff,

-vs- CASE NO.: 25-CV-8174-SPL

TONY SAMOJEN,

Defendant.

---

Volume 1, Part 2

Video Examination of TONY SAMOJEN, taken at the instance of the Plaintiff, under and pursuant to the Federal Rules of Civil Procedure, pursuant to Notice of Deposition, before SHERYL L. STAWSKI, a Registered Professional Reporter and Notary Public, in and for the State of Wisconsin, taken via Zoom videoconference, on the 11th day of August, 2026, commencing at 10:59 a.m. PDT and concluding at 2:13 p.m. PDT.

A P P E A R A N C E S

McDONALD HOPKINS, LLC, by
MR. PATRICK O'MEARA
300 North LaSalle Street, Suite 1400
Chicago, Illinois, 6-654
Appeared on behalf of the Plaintiff.

SILENCE LAW GROUP, by
MR. TREVOR COOK
20235 North Cave Creek Road, Suite 104 #460
Phoenix, Arizona, 85024
Appeared on behalf of the Defendant.

Videographer: Ms. Jamie Popper, Veritext Legal Services.

| EXAMINATION BY: | PAGE |
|---|---|
| MR. O'MEARA | 26 |

I N D E X

| EXHIBITS: | MARKED | ID |
|---|---|---|
| Exhibit 1 - Window Sticker | 26 | 26 |
| Exhibit 2 - Defendant's First Amended and Second Supplemental Responses to Plaintiff's First Set of Interrogatories | 26 | 30 |
| Exhibit 3 - Defendant's Responses to Plaintiff's First Set of Interrogatories | 36 | 36 |
| Exhibit 4 - Text Messages, Chris-Tony | 51 | 52 |
| Exhibit 5 - Emails re Stocker, Jim-Tony | 64 | 65 |
| Exhibit 6 - Defendant's First Amended and Supplemental Responses to Plaintiff's First Set of Requests for Admission | 88 | 89 |
| Exhibit 7 - Emails re Window Sticker | 113 | 113 |
| Exhibit 8 - Email, Subject: Agreement | 115 | 116 |
| Exhibit 9 - Emails re Parts | 119 | 119 |
| Exhibit 10 - Email re Revised Timeline | 124 | 124 |

TRANSCRIPT OF PROCEEDINGS

(The following is a continuation of testimony taken of TONY SAMOJEN, having been first duly sworn by the previous court reporter.)

(Exhibit Nos. 1 and 2 were previously marked and shared.)

THE VIDEOGRAPHER: We are back on the record. The time is 10:59 a.m.

BY MR. O'MEARA:

Q All right. Mr. Samojen, I believe you may have Exhibit 2 in front of you. Can you take -- can you take a look at Exhibit 1, please.

A Going back to Exhibit 1. Yes, I have one.

Q Okay. Do you recognize Exhibit 1?

A Yes.

Q What is it?

A It's a replication of a dealer sticker that we used for car shows.

Q When you say that it is "a replication," what do you mean by that?

A At car shows people would walk by, and we used it specifically on the 2006 show. It was placed in the window, and it answered a lot of people's questions, what was on the car, because the car was not a stock 914/6. It was a 914/6 GT.

engine.
Q You mentioned the engine. What is that? What's significant about the engine?
A Stock Porsches came with a 2-liter carburated engine producing 110 horsepower. The competition engine that went into 914/6 GT cars could have been 180 horse or 210.
The IMSA motor was an engine that was two-and-a-half liters where the regular engines were 2 liters, and it produced 270-horsepower; a very desirable engine.
Q So apart from him asking generally about the car and you responding like that, you didn't -- he didn't talk about that car at all otherwise that day?
A No. He showed no interest in it.
Q Okay. So he wasn't -- you didn't notice him looking at the car and admiring it?
A I don't know what he did.
Q Okay. So he -- he may have been looking at it, but you don't know?
MR. COOK: Objection.
BY MR. O'MEARA:
Q You can answer.
A I just didn't see him pay any attention or ask

questions.
Q Okay. So eventually Jim leaves. Approximately how long is he at your house, you know, in the garage area?
A I guess maybe an hour, hour and a half. I'm not sure.
Q Okay. What -- I assume he -- he came and talked to you before leaving. What was the conversation like with him before he left?
A He asked for the records --
Q Okay.
A -- on 01.
Q What did you do in response to that?
A I gave him my information on 01.
Q Did he -- did you make any other conversation about the cars or anything, or did he really just ask for --
(Simultaneous speaking.)
BY MR. O'MEARA:
Q No small talk; no where are you -- where are you going to dinner tonight?
A Him and Kerry went out to lunch. They said let's get something to eat.
Q So they -- this was -- did he come over in the morning?

A Somewhere around noontime.
Q Okay. And they had -- they had just come out -- come -- they came over from lunch, or they were headed to lunch after they were leaving?
A After -- they were going to go have lunch after they were leaving.
Q Okay. So Jim tells you he's going to leave, and he asks for documentation on 01.
Do you -- do you have the documentation ready to go, or did you have to go get it for him?
A I had to go get it. I just grabbed a bundle of -- a folder that said 914, and it was basically the full history of 40 years of -- not the 40 years -- it was just all the -- 0011 stuff that was done to it and all the special items in the car like spot welds.
Q Okay. And so you got him -- so there's -- and all that documentation was in a single binder for 011, right?
A It was in a binder. I don't remember. I can't recall if it was one or two binders. I just don't remember.
Q Okay. And did you also get him the binder for Porsche 1543?

A Not to my knowledge, I didn't.
Q Do you remember giving him two binders?
A No, I do not.
Q Do you distinctly remember giving him one binder?
A I remember giving him a binder.
Q Do you deny that you gave him the binder for 1543?
A Not to my knowledge. I don't -- just don't remember.
Q So you may have given him the binder for 1543, but you don't remember?
A I don't remember.
Q Okay. Where do you keep the binders?
A On a shelf in my office.
Q Did you get them yourself?
A What was the question again?
Q Did you go to retrieve the binder yourself?
A Yes, I did.
MR. COOK: Objection.
MR. O'MEARA: Okay. I'm going to add an exhibit to the exhibit share.
(Exhibit No. 6 was marked and shared.)
BY MR. O'MEARA:

Q You should have access to Exhibit No. 6 now.
A Exhibit 6?
Q Yes.
A It looks like you don't have permission for this resource.
Q Can you -- are you able to access other exhibits, like, if you click on one of the ones we looked at before? Are you getting the same message?
A Okay, I see Exhibit 6.
Q Okay.
A 8/11 of '26.
Q Yes. So this is a discovery response similar to some of the ones we looked at earlier. There's a title that's under the "District of Arizona" that says "Defendant" --
A Where you on this?
Q On page 1 do you see there's like a thing that's called a caption. It says "James Edwards v. Tony Samojen" next to the --
A "Tony Samojen serves these responses," is that the one?
Q Above that. So there's a title that's all in bold in capital letters. It says, "Defendant Tony Samojen's First Amended and Supplemental

Responses to" --
A I see it.
Q You see it, okay. Have you seen this document before, Mr. Samojen?
A I have to go through it to see what is here.
Q Sure. So unlike the other documents that we were looking at, you didn't sign anything putting yourself under oath as to these; but let's go -- why don't you scroll down to page 4.
I'm going to ask you about what's technically an answer to "Request for Admission No. 9" that starts on page 3, and I'm going to ask you about the "Amended Answer" part; but feel free to review the whole request for admission and response, and then let me know when you're ready.
A Okay. Do I have to do anything?
Q Just let me know if you've read it. Have you read it?
A Trying to. There's a lot of stuff here. I'm not sure what I'm looking at.
Q Okay. Well, do you see the bold -- I can try to short-circuit this, and then if you need to review more, just let me know; but -- so there's some bold text that says "Amended Answer,"

house and picked it up and gave it to you, but it's more likely to infer that he probably brought it back, right?

MR. COOK: Objection.

THE WITNESS: What was the question?

BY MR. O'MEARA:

Q The question is -- I'll withdraw the question.

So Jim -- you give Jim the binder for Porsche 011; and he leaves your house, right?

A Yes.

Q Okay. And you also give Jim the binder for Porsche 1543; and he leaves your house, right?

MR. COOK: Objection.

THE WITNESS: Not to my knowledge.

BY MR. O'MEARA:

Q Okay. Well, Jim leaves; and then the next day he comes back, right?

A Okay, he came back.

Q Okay. Did -- when he was leaving, did he say that he would come back at a particular time the next day; or how did that work?

A I don't remember.

Q Okay. Did he call you to tell you he was coming back over the next day?

A Before he left he said he was coming back the

next day.
Q Okay. What time did he arrive?
A What time?
Q Yeah. Approximately what time did Jim arrive at your house?
A I can't remember.
Q Okay. Was it the morning?
A It was during the day, midday.
Q Okay. What's the first thing you remember about when Jim arrives?
A He said he was in a rush, and I have to go catch an airplane.
Q Okay. What -- what happened next?
A He left.
Q So did he give you the binder? Did he give you a binder back?
A Yes, he did.
Q Did he give you two binders back?
A I can't remember.
Q Okay. Did Jim -- how long is your recollection that Jim stayed at your house that day?
A I don't know.
Q Is it less than five minutes?
A I can't remember. I don't know.
Q Okay. Was it more than -- more than an hour?

A I don't remember.
Q Okay. Where was Porsche 011 on Sunday when Jim arrived?
A Same place he left it on Saturday.
Q Okay. What about Porsche 1543?
A Same place he left it on Saturday.
Q Okay. Did he talk to you about Porsche 1543 that day?
A No talk whatsoever about 1543.
Q Did he look at Porsche 1543 that day?
A Not to my knowledge.
Q While Jim was at your house on Sunday the 24th, were you -- was he ever outside of your presence?
A I don't remember.
Q Did he come in your house?
A No.
Q So was -- while he was there he was in the garage the whole time?
A Yeah. The house is about 100 feet away.
Q And -- and you don't remember whether he talked about 1543 at all, or you're saying he didn't?
A Did not talk about 1543 at all.
Q No mention of 1543, and he didn't inspect 1543?
A What's the question?

Q And he also didn't inspect 1543?
A I -- I don't remember him spending any time with the car.
Q And you don't even remember him looking at it?
A No. That was not the car that was for sale.
Q Okay. And so when Jim gave you the documentation that you gave him back, you don't remember noticing that there were two binders instead of one, correct?
A I don't remember.
Q Okay. And Jim at this point didn't mention possibly doing a two-car deal involving both Porsches, right?
A There was no mention of anything on 1543.
Q Okay. So you didn't tell him that it originally came from Prestige Motors that day, right?
A Nothing was mentioned about 1543.
Q Okay. So nothing at all -- nothing about the car's history, correct?
A No, other than the opening statement on Saturday.
Q And the opening statement was just a --
A 914/6 GT with a 2.5 liter IMSA.
Q Okay. And so -- I think I know the answer to these questions, but -- so you did not -- there

was no discussion about -- on Sunday -- about whether it was a -- a 914/6 R?

A No conversation really occurred on Sunday that I can remember.

Q Okay. Did you discuss -- did he indicate whether he was interested in purchasing Porsche 011?

A No. No price; no amount was discussed.

Q Okay. Did he comment on any of the literature in the binders that he reviewed?

A No comments whatsoever.

MR. COOK: Objection.

BY MR. O'MEARA:

Q No comments on the literature about 011 that he reviewed, right?

A What was the question on 011?

Q There was no comment that you remember by Jim about the literature for 011 that he reviewed, right?

A All we did is -- he reviewed 011. That was the car that he was interested in purchasing.

Q Okay. And you don't recall any discussion by him of any of the literature that you gave him about 011, right?

A No discussion whatsoever.

Q Okay. And you don't know whether you gave him literature for Porsche 1543; but, either way, you don't remember him discussing any of the literature about Porsche 1543, right?
A Yes.
Q So after -- after Mr. Edwards -- what did Mr. Edwards say when he was leaving your house?
A That I have to go catch an airplane; I'm running late.
Q Okay. Did he tell you whether he would be in touch?
A I assumed he would deal through Kerry.
Q Okay. Was Mr. Morse there that day as well?
A (No verbal response.)
Q What was your answer?
A No.
Q Was -- was your son Chris there?
A No.
Q Okay. So then Mr. Edwards leaves, and he goes to the airport; and what's the next thing that happens in, like, the story of this eventual sale?
A I got a call from Kerry saying that Edwards had offered a price for the car.
Q Okay. What -- do you remember when that call

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

---

JAMES EDWARDS,

Plaintiff,

-vs- CASE NO.: 25-CV-8174-SPL

TONY SAMOJEN,

Defendant.

---

Volume II

Video Examination of TONY SAMOJEN, taken at the instance of the Plaintiff, under and pursuant to the Federal Rules of Civil Procedure, pursuant to Notice of Deposition, before SHERYL L. STAWSKI, a Registered Professional Reporter and Notary Public, in and for the State of Wisconsin, taken via Zoom videoconference, on the 14th day of August, 2026, commencing at 7:23 a.m. PDT and concluding at 12:19 p.m. PDT.

A P P E A R A N C E S

McDONALD HOPKINS, LLC, by
MR. PATRICK O'MEARA
300 North LaSalle Street, Suite 1400
Chicago, Illinois, 6-654
Appeared on behalf of the Plaintiff.

SILENCE LAW GROUP, by
MR. TREVOR COOK
20235 North Cave Creek Road, Suite 104 #460
Phoenix, Arizona, 85024
Appeared on behalf of the Defendant.

Videographer: Mr. Bruce Beard, Veritext Legal Services.

| EXAMINATION BY: | PAGE |
|---|---|
| MR. O'MEARA | 136 |

I N D E X


| EXHIBITS: | MARKED | ID |
|---|---|---|
| Exhibit 1 - Email re Yellow Fever | 137 | 138 |
| Exhibit 2 - Email re Jim Edwards' Info | 139 | 139 |
| Exhibit 3 - Email re GT Pictures with Link | 142 | 142 |
| Exhibit 4 - Email re Pictures and Spec Sheet | 146 | 146 |
| Exhibit 5 - Emails re Pictures and Spec Sheet and Window Sticker Attachment | 155 | 156 |
| Exhibit 6 - Email re 914-6 GT Pictures and Spec Sheet | 169 | 169 |
| Exhibit 7 - Emails re Porsche Engine Parts | 180 | 181 |
| Exhibit 8 - Emails re Porsche Engine Parts | 184 | 184 |
| Exhibit 9 - Emailed Sale Agreement | 187 | 188 |
| Exhibit 10 - Emails re Agreement | 190 | 190 |
| Exhibit 11 - Emails re Agreement | 192 | 192 |
| Exhibit 12 - Emails re Demand and Correspondence from Michael Croghan | 204 | 205 |
| Exhibit 13 - Correspondence of 7/28 to Michael Croghan | 207 | 207 |
| Exhibit 14 - SMS Export Text Messages from 5/26/25 to 9/11/25 | 212 | 212 |
| Exhibit 15 - Email, 8/31/25 re Legal | 223 | 223 |
| Exhibit 16 - SMS Export Text Messages from 9/11/25 to 6/8/26 | 233 | 233 |
| Exhibit 17 - Emails re Porsche Parts | 240 | 240 |
| Exhibit 18 - Email 12/29/25, Dates with Jim | 243 | 243 |
| Exhibit 19 - Emails re Carney Forensics | 245 | 245 |
| Exhibit 20 - Emails, March 2026 re MSN Records | 249 | 249 |

TRANSCRIPT OF PROCEEDINGS

THE VIDEOGRAPHER: We are on the record. The time is 7:23 Pacific Time on August 14, 2026.

This deposition is being conducted remotely, using virtual technology. The recording will continue until all parties agree to go off of the record.

And this is media one of continued video recorded deposition of Tony Samojen, taken in the -- taken for counsel of plaintiff, in the matter of James Edwards versus Tony Samojen, Case 25-CV-8174, in U.S. District Court, District of Arizona.

My name is Bruce Beard, the videographer, for CMI Productions representing Veritext Legal Solutions. The court reporter, Sheryl Stawski, for Veritext Legal Solutions.

If there are any objections to proceeding, state them at the time of your appearances. Now, Counsel, state your appearance for the record beginning with noticing attorney, and then the witness will be sworn in.

MR. O'MEARA: Patrick O'Meara,

noticing attorney for plaintiff, no objection.

MR. COOK: Trevor Cook representing Defendant Tony Samojen.

TONY SAMOJEN, called as a witness herein, having been first duly sworn on oath, was examined and testified as follows:

EXAMINATION

BY MR. O'MEARA:

Q Good morning, Mr. Samojen. On Tuesday we discussed some ground rules for the deposition. Do you agree that those still apply?

A Yes.

Q Okay. Do you have a recollection as to when Mr. Edwards first showed interest in Porsche 1543?

A When he came to the house, he showed virtually no interest in the car. During our inspections of 011, no interest in the car. When we went to his house, he did not mention -- I can't remember him mentioning the car.

First time he mentioned it is when he submitted -- from what I can remember -- submitted his offer for the package, and it included 1543; and that was on the drive to the airport before we left.

which I'm not sure we delivered; but I know it was in the 914 archive folder.

Q Right. So he -- and you know he asked for the window sticker; and this was after you had sent him a spec sheet on Porsche 1543, right?

A No, the spec sheet would have been in the archive folder along with a picture of the window sticker.

Q Okay. But that may be true; but, sir, we just looked at you emailing him a copy of it, right?

A I don't remember sending him that copy.

Q Well, we just looked at an email. Did that email not refresh your recollection about doing that?

A No, I do not remember or recollect sending him that sticker.

Q Okay. But do you dispute that you sent him the spec sheet by email on October 30?

A No, I do not dispute that.

Q Okay. Based on the fact that you were sending him the spec sheet, do you think at this point on October 30 that you were talking to Mr. Edwards as someone who was potentially interested in a transaction involving Porsche 1543?

A No, I do not.
Q Okay. So why do you think Mr. Edwards was asking you for a spec sheet about Porsche 1543?
A Because he's a car dealer.
Q Okay. Why do you think he was asking you for a copy of the original window sticker for a Porsche 1543?
A I'm not sure. I wasn't in his mind.
Q Based on how -- the phrasing in Mr. Edwards' question, don't you think that he believes that you have an original window sticker for Porsche 1543?
MR. COOK: Objection.
THE WITNESS: He never made any presentations to me.
BY MR. O'MEARA:
Q What do you mean by that?
A Any verbal presentations or showed interest in the car.
Q Isn't asking for information about the car showing interest in the car?
A Maybe a week later.
Q Okay. But we're talking -- we're talking about October 30 right now.
A I just see undeliverable 914/6 GT.

Q But the email at the top of the page, that we've discussed already multiple times, is where he asks you for a copy of the original window sticker, right?
A And I don't -- he may have asked for it, but I don't think I replied.
Q Okay. So you don't think you replied to give him the sticker, and you also don't think you replied in any way that would have informed him that you don't actually have an original window sticker, right?
MR. COOK: Objection.
THE WITNESS: I was never asked.
BY MR. O'MEARA:
Q What do you mean by you were "never asked"?
A He never asked for information from me on 1543. Definitely did not ask about the window sticker, if he had it.
Q You -- you have already testified, sir, that he asked you for a copy of the original window sticker in the email that we -- we just looked at.
A And I never sent it because I did not have it.
Q Okay. But I'm trying to reconcile your -- your statement that he never asked you for

information about Porsche 1543 with the fact that he asked you for the original window sticker for that car.

How are those things both true?

A It's in an email, but I never responded.

Q Okay. So he -- so he asked you for information. You didn't respond, correct?

A Asked me for the original window sticker.

Q Yes.

A Did not provide that.

Q Did you tell him that -- that you did not provide that?

A According to the emails, that was our conversation on it.

Q Was it your recollection, sir, that you did not provide -- or did you not tell him that you could not provide the original window sticker?

A I never responded.

Q And I'm -- I'm -- I thought that you said that you don't know whether you sent the email attaching the original -- or, sorry, strike the question.

I thought that your testimony was that you don't know whether you sent the email that appears to be a response from you attaching

the 914/6 --
A I don't remember sending --
Q Sir, I'm not finished with my question. I apologize if you thought that I was done.
You don't remember whether you sent the Porsche 1543 window sticker in response to Mr. Edwards' email, correct?
A No, I do not remember.
Q Okay. You later went on to enter into a transaction with Mr. Edwards involving Porsche 1543, right?
A Edwards put together, took over all the price quotes and took over coming up with a price and what to trade.
Q Is that a yes?
A Yes, that Edwards took over the -- the cost estimates for the cars and the -- presented a price in trade.
Q And based on the October 30 e-mail where Mr. Edwards asked you for a copy of the original window sticker, you knew that he thought that you had an original window sticker for that car, correct?
A No, I did not know that. The thought -- the window sticker was in our archives folder, and I

had forgotten about it. It was --
MR. COOK: Objection.
THE WITNESS: -- after 2006 and remained there and was never shown. I had completely forgotten about it.
MR. COOK: Please interpose an objection to that last question.
And, Tony, right before you answer, give me just a second to object if I need to, and then continue --
THE WITNESS: Okay.
MR. COOK: -- continue with your answer.
BY MR. O'MEARA:
Q Let's go back to Exhibit 5, please. So that -- this is the email which you don't know whether you sent where it appears that an email from Tony Samojen is attaching the Porsche 1543 window sticker that you created, correct?
MR. COOK: Objection.
THE WITNESS: It says, "Did you have a copy of the original window sticker."
BY MR. O'MEARA:
Q It does say that. And then above that -- but at 8:03 a.m. time there's a response that appears